UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
AT LOUISVILLE

PNC BANK, NATIONAL ASSOCIATION                                    PLAINTIFF

v.                                              CIVIL ACTION NO. 3:13CV-297-CRS

SEMINARY WOODS, LLC, et al.                                       DEFENDANTS

### MEMORANDUM OPINION

Litigation, as the last bastion of crumbling business ventures, rarely takes prisoners. This foreclosure action is no different. There will be no winners here, despite the declaration of a victor at the conclusion of the case.

Magistrate Judge James D. Moyer spent many hours attempting to mediate the matter to settlement, but without success. The court will therefore decide the outstanding legal issues in order to bring this case to a conclusion.

For the reasons set forth herein, the court will enter a separate order rendering the following rulings:

1. The motion of PNC Bank, National Association, to dismiss Counts I through VIII (fraud/fraudulent inducement, fraudulent omissions, violation of KRS 286.8-010, *et seq.*, negligence/negligent misrepresentations, declaratory judgment: economic duress, tortious interference with contract, tortious interference with prospective business advantage, breach of contract/breach of duty of good faith and fair dealing), Count X (promissory estoppel), and Count XI (punitive damages) of the Counterclaim [DN 56] of Seminary Woods, LLC, Seminary Woods Condominiums Council of Co-Owners, LLC, Whittington Realty Partners LLC, Norman E. Risen,

Anna J. Risen, Kent E. Risen, Marc H. Risen, Linda Risen, C. Ronald Wise, and Jennifer S. Wise (collectively, "Seminary Woods") **(DN 73)** will be **GRANTED.**

2.   The motion of PNC Bank, National Association, to dismiss the counterclaims (fraud/fraudulent inducement (Count One), fraud by omission (Count Two), violation of KRS 268.8-010, *et seq*. (Count Three), negligent misrepresentation (Count Four), promissory estoppel (Count Five), equitable estoppel (Count Six), and punitive damages (Count Seven)) [DN 107] of Laurence and Patricia Benz and Albert and Patricia Fiorini (collectively, the "Benz/Fiorini parties" or the "Benz/Fiorinis") **(DN 109)** will be **GRANTED.**

3.  The motion of the Benz/Fiorini parties to amend their counterclaims and answer **(DN 119)** will be **DENIED** on the ground of futility.

4.   The motion of PNC Bank, National Association, for leave to file a sur-reply to the Benz/Fiorini parties' motion to amend their counterclaims and answer **(DN 143)** will be **GRANTED**.

5.   The motion of Benz/Fiorini parties for summary judgment **(DN 157)** will be **DENIED.**

6.   The petition of Receiver NTS Development Company for advice **(DN 180)** will be **DENIED.**

7.   The motion of Stephen J. Evans and Gerry Evans for summary judgment **(DN 195)** will be **DENIED AS AGAINST PNC BANK, NATIONAL ASSOCIATION.**

8.   The cross-motion of PNC Bank, National Association, for summary judgment against Stephen J. and Gerry Evans **(DN 202)** will be **GRANTED.**

9.   The motion of Seminary Woods for leave to file a second amended counterclaim **(DN 232)** will be **DENIED** on the ground of futility.

10.  The motion of Seminary Woods for leave to file a supplemental response to PNC Bank, National Association's motion to dismiss various counterclaims of Seminary Woods **(DN 233)** will be **GRANTED.**

11.  The renewed petition of Receiver NTS Development Company for advice **(DN 244)** will be **DENIED.**

<u>I.  Background</u>[1]

A.

The motions presently before the court arise in the context of this foreclosure action filed by PNC Bank, National Association[2] ("PNC"), on certain mortgaged property known as the Seminary Woods condominium project.  The following background facts are alleged in the Complaint.

The condominium building is located at 6600 Seminary Woods Place in Jefferson County, Kentucky.  The project was intended to contain a total of sixty-three condominiums and five garage units.  As of the time of the filing of the Complaint, nineteen condominium units and five garage units had allegedly been developed with forty-four additional units still to be constructed.  Of the nineteen constructed units, fourteen had been sold to third-parties and five units and five garage units were owned by the entity Seminary Woods, LLC.  The development of the property has come to a virtual standstill, and the property is now in receivership ordered by this court.

---

[1]A portion of this text is taken from an earlier opinion of the court in this case.

[2]The lender for the Construction Loan Agreement and some loan modifications was National City Bank of Kentucky ("NCB"), predecessor by merger to PNC.  In this background section, the court refers to NCB and PNC where applicable.  Later in the opinion, reference is made to NCB and PNC almost exclusively as "PNC," as the distinction between the entities is most often of no significance in the context of those arguments.

B.

On April 19, 2006, NCB, as lender; Seminary Woods, LLC, as borrower; and C. Ronald Wise, Jennifer Wise[3], Laurence N. Benz, Patricia G. Benz, Albert E. Fiorini, Patricia A. Fiorini, Norman E. Risen, Anna J. Risen, Marc H. Risen, Linda Risen, and Kent E. Risen, as guarantors, entered into a Construction Loan Agreement for the development of the Seminary Woods project.[4] Contemporaneously therewith, Seminary Woods LLC executed a Promissory Note evidencing the loan described in the Construction Loan Agreement in the principal sum of $29,220,000.00 plus interest.  To secure payment of the Promissory Note, Seminary Woods LLC also executed a Mortgage, Security Agreement, Fixture Financing Statement, an Assignment of Rents and Leases, and a Guaranty Agreement executed by each of the guarantors.

The above documents were amended in writing numerous times with the most current iterations consisting of:

(1)  Third Amendment to Note, Eleventh Amendment to Construction Loan Agreement, and Reaffirmation of Guarantors (DN 1-32) executed July 26, 2010; and

(2)  Amended and Restated Eleventh Amendment to Mortgage, Security Agreement and Fixture Financing Statement, and Assignment of Rents and Leases (DN 1-35) executed February 12, 2013.

---

[3]C. Ronald and Jennifer Wise have been dismissed from the action as well as all counter claims/cross-claims asserted by them. (DN 103).

[4]From time to time throughout this opinion the court may refer to these entities collectively  as the "contracting parties."

Additionally, on December 18, 2012, PNC, Seminary Woods, and the guarantors entered into an Agreement Regarding Release of Unit 903 (DN 1-33).[5]

The obligations of the various contracting parties to the agreements and guaranties were consistently and clearly carried forward and reaffirmed throughout the iterations. The Third Amendment to Note, Eleventh Amendment to Construction Loan Agreement, and Reaffirmation of Guarantors contains the following language regarding consent to term, reaffirmation and ratification of the original obligations, and the release of claims against PNC:

> 3.3  Guarantor Consent.  The Guarantors hereby consent and agree to the terms, covenants, and provisions of this Third Amendment, and each Guarantor hereby reaffirms and ratifies his or her respective continuing obligations under the terms of the 2006 Guaranties (as modified by the Second Amendment with respect to the Primary Note Payment Guaranty) and each further reaffirms and ratifies his or her respective continuing obligations under the terms of the Supplemental Note Payment Guaranties.

> 3.4  **Release.  Borrower and each Guarantor hereby fully and forever release, acquit, and discharge Bank, its affiliates, subsidiaries, shareholders, directors, officers, employees, servants, representatives, agents, attorneys, and other persons acting on behalf of any of the foregoing, and the heirs, representatives, successors and assignees of each of them from any and all liability on account of any and all claims, demands, actions, or causes of action whether in law or in equity or otherwise, whether in contract or tort or pursuant to any statute, code, ordinance or regulation, whether direct or indirect, whether known or unknown, whether presently discoverable, whether suspected, unclaimed or claimed, including, without limitation  that class of claims popularly known as "lender liability" which the Borrower or Guarantor ever had, now has or may have against Bank arising out of or in any way related to loan transactions with Bank, loan requests to Bank, the Loan Documents, the negotiation and execution of this Agreement or relationships or transactions of any kind or nature involving the Bank, Borrower, and any Guarantor or their related entities or persons, employees, agents, affiliates successors or assignees.  The Borrower and Guarantors represent, warrant, and acknowledge that adequate, sufficient good and valuable consideration, in the form of the Bank's waiver of the existing Event of Default, the extension of the Curtailment Dates and other**

---

[5]The contracting parties also discuss a similar 2013 Agreement Regarding Release of Unit 603.  Paragraph 33 lists Unit 603 as a "Sold Unit."  However, the release agreement is not mentioned in the Complaint.

**valuable consideration, have been received from Bank for this release.  This section is set out in bold type to emphasize its importance to Bank as part of the consideration for this Agreement.**

DN 1-32, p. 8.

Two years after the contracting parties executed the above-quoted document, they executed an Agreement Regarding Release of Unit 903 in which they affirmed their understanding and agreement with various recitals contained therein, including the following:

C.   The Primary Note matured on September 30, 2011 and remains unpaid. Borrower sought extension of the Maturity Date, and tendered to Lender its check for an extension fee; however, Borrower has not made Principal Curtailment Payments required by the Third Amendment, and Lender did not agree, in writing or otherwise, to an extension of the Maturity Date and did not negotiate the check tendered by Borrower.  Since the Maturity Date, Borrower has sought forbearance from Lender regarding Lender's enforcement rights.  Borrower notified Lender on December 28, 2011, that it could no longer make interest payments to Bank and renewed its request to Bank for a forbearance of its rights upon default.  The parties have been and are currently engaged in discussion regarding various options available for repayment of the obligations of Borrower and Guarantors under the Loan Agreement and respective Guarantees, and concurrent with those discussions desire to enter into this Agreement now to evidence the terms of the sale of Unit 903 to the Porters...

DN 1-33, pp. 1-2.

The contracting parties thus clearly acknowledged and affirmed for the third time in July of 2010 their respective obligations under the note and guaranties, and fully released any and all claims against PNC in connection with the financial transactions relating to the project.  The contracting parties confirmed in August of 2012 that the note had matured and was and remained unpaid.  PNC conditioned the release of Unit 903 for sale to the Porters on the Borrower's and Guarantors' agreement to certain conditions including, in particular, that

- 6 -

B.  Events of Default exist under the Loan Documents as set forth in the Recitals hereto and said Events of Default continue and are not intended, nor should they be construed, to be waived by Lender as a result of this Agreement.

C.  Lender has the right to seek remedies under the terms and conditions of the Loan Documents...

Article 2
...Section 2.03  Guarantor Consent.  The Guarantors hereby consent and agree to the terms, covenants and provisions of this Agreement, and each Guarantor hereby reaffirms and ratifies his or her continuing obligations under the terms of the 2006 Guaranties and further reaffirms and ratifies his or her respective continuing obligations under the terms of the Supplemental Loan Guaranties.

Section 2.04  No Substitution or Novation.  Nothing in this Agreement shall be construed as a substitution or novation of the Borrower's indebtedness to the Lender under the Loan Documents, which shall remain in full force and effect as hereby amended and the terms of which are hereby reaffirmed by the Borrower and Guarantors.

DN 1-33, pp. 3-4.

We thus come to March 5, 2013 when PNC filed the Complaint in this court.  It declared the

loan in default and sought recovery from all obligated defendants pursuant to the Note, Mortgage,

Security Agreement, and Guaranties.  As stated in the Complaint (DN 1, ¶ 6):

This is an action to enforce a mortgage (the "Mortgage") given to National City Bank of Kentucky, now by merger known as PNC Bank, National Association, on real property located in Jefferson County, Kentucky, owned by the mortgagor and defendant, Seminary Woods, LLC, which was developed as a condominium project commonly know as Seminary Woods (the "Project").  The Bank also seeks a money judgment against Seminary Woods, LLC and guarantors of indebtedness to the Bank, for their respective obligations, as alleged more fully herein, to repay the unpaid balance owed on a promissory note, the repayment of which is secured by a mortgage, a security agreement and personal guarantees.  In connection with the development of the Project, N. Risen, M. Risen, and K. Risen incorporated Defendant, Seminary Woods Condominiums Council of Co-Owners, Inc. (the "Council"), for the purpose of managing the Project, and the Bank is joining the Council as a party to this action to obtain appropriate relief concerning its activities in connection with the enforcement of the Bank's mortgage.

The agreements evidence that the borrower and guarantors agreed and affirmed repeatedly that Events of Default under the Loan Documents occurred and were not remedied.  Upon the filing of suit against them, they now attempt to challenge the enforceability of those documents against them.

PNC also states in the Complaint (DN 1, ¶ 24) that:

> The Trustees, the Richards, Merenbloom, Scalzitti, the Royces, A. Fiorini, R. Wise, N. Risen, M. Risen, L. Risen, K. Risen, Whittington [Realty Partners, LLC ("WRP")], MJE Real Estate, the Eichbergers and the Evans are sometimes referred to herein as "Contract Holders."  The Contract Holders are joined as defendants in this action in order to require them to assert any interest they may have in the Project.[6]

In challenging the enforceability of the various agreements, the "Seminary Woods"[7] and the "Benz/Fiorini"[8] defendants have proceeded in this case separately, filing their own motions and responsive briefs.  However,  there is significant overlap in their positions.  To that extent, their contentions will be addressed together.  For simplicity, the court's references below to "the contracting parties" will refer to the parties to the loan documents including, particularly, the various versions of the Construction Loan Agreement, Note, and Guaranty Agreements.  Where appropriate, the court will refer to arguments made by particular defendants.

---

[6]Not all of the Contractor Holders have participated in the motion practice presently before the court.

[7]Consisting of the group of Counter-Plaintiffs, Seminary Woods, LLC, Norman E. Risen, Anna J. Risen, Kent E. Risen, Marc H. Risen, Linda Risen, Seminary Woods Condominium Council of Co-Owners, Inc., and Whittington Realty Partners, LLC.

[8]Consisting of the group of Counter-Plaintiffs, Laurence N. Benz, Patricia G. Benz, Albert E. Fiorini, Patricia A. Fiorini.

C.

The contracting parties filed Answers to the Complaint and Counterclaims ("CCs") against

PNC.  The following list delineates the various counterclaims of the contracting parties in their

current pleadings and/or proposed amended pleadings:

Fraud/Fraudulent Inducement:  Seminary Woods Amended CC (DN 56), Count 1
           Benz/Fiorini CC (DN 107), Count 1
           Seminary Woods Proposed 2d Am. CC (DN 232-2),
            Counts 5 - 7
           Benz/Fiorini Proposed Am. CC (DN 119-1), Counts 1, 6

Fraudulent Omissions:    Seminary Woods Am. CC, Count 2
           Benz/Fiorini CC, Count 2
           Benz/Fiorini Prop. Am. CC, Count 1

Violation of KRS 286-8-220(2)  Seminary Woods Am. CC, Count 3
           Benz/Fiorini CC, Count 3
           Benz/Fiorini Prop. Am. CC, Count 2

Negligence/Negligent Misrep.:  Seminary Woods Am. CC, Count IV
           Benz/Fiorini CC, Count 4
           Seminary Woods Prop. 2d Am. CC, Counts 8 - 10
           Benz/Fiorini Prop. Am. CC, Count 3

Economic Duress:     Seminary Woods Am. CC, Count 5

Tortious Interfer. w/Contracts:  Seminary Woods Am. CC, Count 6
           Seminary Woods Prop. 2d Am. CC, Counts 1 - 2

Tortious Interfer. w/Prospective
Business Advantage:    Seminary Woods Am. CC, Count 7

Breach of Contract/Breach of
Duty of Good Faith:    Seminary Woods Am. CC, Count 8

|  | Seminary Woods Prop. 2d Am. CC, Counts 3 - 4 |
|  | Benz/Fiorini Prop. Am. CC, Count 7 |

| Equitable Mortgage/Equitable Lien - Decl. Judgment: | Seminary Woods Am. CC, Count 9 |
|  | Seminary Woods Prop. 2d Am. CC, Count 11 |
|  | Benz/Fiorini Prop. Am. CC, Count 10 |

| Promissory Estoppel: | Seminary Woods Am. CC, Count 10 |
|  | Benz/Fiorini CC, Count 5 |
|  | Benz/Fiorini Prop. Am. CC, Count 4 |

| Equitable Estoppel: | Benz/Fiorini CC, Count 6 |
|  | Benz/Fiorini Prop. Am. CC, Count 5 |

| Violation of Equal Credit Opportunity Act & Reg. B: | Benz/Fiorini Prop. Am. CC, Count 9 |

| Punitive Damages: | Seminary Woods Am. CC, Count 11 |
|  | Benz/Fiorini CC, Count 7 |
|  | Benz/Fiorini Prop. Am. CC, Count 8 |

The defendants do not dispute that the loan came due and remains unpaid. The essential premise of the contracting parties is that they were fraudulently induced to enter into the agreements with PNC by alleged misrepresentations or omissions concerning the availability of End User Financing ("EUF"), mortgage loan products which they wished to suggest to potential purchasers of the condominium units. Most of the legal theories asserted in the counterclaims rise or fall on the issue of PNC's purported promise to offer an EUF program for the benefit of prospective condominium purchasers.

- 10 -

## II.  DISCUSSION

### A.  Legal Standard

Under Fed. R. Civ. P. 8(a)(2), a pleading must contain a short and plain statement of the claims showing that the pleader is entitled to relief. The pleading standard in Rule 8(a)(2) does not require detailed factual allegations, but "demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2008) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (1955)).

To withstand a Rule 12(b)(6) motion to dismiss for failure to state a claim, it is not enough that the complaint contains "facts that are merely consistent with a defendant's liability," rather, a plaintiff must allege "facts – not legal conclusions or bald assertions – supporting a 'plausible' claim for relief." *Id.* at 687 (*quoting Twombly*, 550 U.S. at 557)). A complaint that offers legal conclusions or a recitation of the elements of a cause of action will not meet this pleading standard. *See id.* "[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Mezibov v. Allen*, 411 F.3d 712, 716 (6th Cir. 2005). The court must take all of the factual allegations in the complaint as true, but is "not bound to accept as a true legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678. If the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has not shown the pleader is entitled to relief. *Id.* at 677-78.  *See also, Buridi v. Branch Banking and Trust Co.,* No. 3:12-CV-0486-S, 2013 WL 1309763 (W.D.Ky. March 25, 2013); *Our Lady of Bellefonte Hospital, Inc. v. Tri-State Physicians Network, Inc.*, No. 06-141-HRW, 2007 WL 2903231 (E.D.Ky. Sept. 27, 2007); *Headwaters Construction Co. v. National City Mortgage Co.,* 720 F.Supp.2d 1182 (D.Idaho 2010).

B.  Analysis of Counterclaims

1. Equitable Lien Claims

First, we note that  PNC has not moved to dismiss Count Nine of Seminary Woods'
Amended Counterclaim which seeks a declaratory judgment that Seminary Woods is entitled to
assert an equitable lien representing various interests which it claims are superior to any claim of
PNC.[9]

The Benz/Fiorinis have sought leave to amend their Counterclaim to add a similar equitable
lien claim to that of Seminary Woods, urging the same legal ground for priority, and alleging that
PNC had actual knowledge that the Benzs and Fiorinis had equity in the project prior to PNC
releasing any of its loan funds for construction and prior to PNC recording its mortgage on the
property.  (DN 119-1, ¶¶ 108, 109).

The Benz/Fiorinis cite to *Tile House, Inc. v. Cumberland Fed. Savings Bank*, 942 S.W.2d
904 (Ky. 1997) in support of their proposed equitable lien claim.  *Tile House* involved the
construction of a home for Michael and Michelle Hannigan and a foreclosure action against their
contractor who failed to complete that construction.  The court stated, in pertinent part, that

> as between the Hannigans and the Cumberland Bank, it is undisputed that
> Cumberland, through its closing officer, had actual notice that the Hannigans were
> purchasers of a lot and had paid $3,000 as a down payment and that they had paid
> another $25,236 on the construction contract.  Consequently, the bank was on actual
> notice of the equitable lien of the Hannigans; however, the mechanics' lienholders
> were clearly not on any notice...The bank, although on notice of the equitable interest

---

[9]This counterclaim is reasserted as Count Eleven of the Proposed Second Amended Counterclaim.  In seeking to file the
Proposed Second Amended Counterclaim, Seminary Woods stated that it "contains additional factual information and specificity
concerning the fraud claim and  otherwise [sic], and clarifies the causes of action therein."  It does not appear that anything is added
to this claim that is not already stated in the original Count Nine.  The remainder of the Amended Counterclaim is subject to
dismissal.  Filing of the Proposed Second Amended Counterclaim will be denied as futile, inasmuch as the embellishments to the
Amended Counterclaim fail to overcome the deficiencies in the original allegations.  Count Nine of the Amended Counterclaim (DN
56) will remain intact, however.

of the Hannigans, did not take any steps to subordinate that interest to their mortgage.

942 S.W.2d at 906.

PNC has objected to the proposed declaratory judgment claim on the ground that, as investors in Seminary Woods, the Benz/Fiorinis have no ability to redress individual injuries resulting from their investment in the project undertaken by the company by asserting an equitable lien for their own benefit.  (DN 130, p. 12).  PNC suggests that "The Benz Parties should seek any relief related to alleged funds spent on the Seminary Woods project as a part of the cross-claims filed in this case among Seminary Woods, LLC and its Members...or in other litigation related to the project pending in the Jefferson Circuit Court..."  (DN 130, p. 12, n. 18).

The Benz/Fiorinis contend that the Benzes bought two condominium units in the building and the Fiorinis own part of one unit.  They contend that they made deposits for those purchases before PNC recorded its mortgage, and thus liken their position to that of the Hannigans.  The problem with this argument is that nowhere in the 106 paragraphs of proposed factual allegations which are incorporated into Count Ten of the Proposed Amended Counterclaim (DN 119-1) are there any allegations concerning their purchase of condominium units nor any allegations with respect to the timing of any such purchases and the filing of the mortgage by PNC.  Thus they do not allege any facts which could possibly bring them within the contours of the *Tile House* principle upon which they urge priority.[10,11]

_____

[10]The fact that PNC has not moved to dismiss Seminary Woods' equitable lien claim is of no moment here.  We do not address, in any respect, the viability of such a claim by Seminary Woods.  However, we note in contrast to the proposed claim by the Benz/Fiorinis that the Seminary Woods claim recounts the dates and amounts of specific unit purchases by Seminary Woods which were allegedly pre-sold in accordance with the Construction Loan Agreement.  The Benz/Fiorinis state nothing more than that they invested in the "Regency Tower" from their personal funds in exchange for "ownership interests."  The facts alleged in paragraphs 1-106 relate almost exclusively to the Seminary Woods project and the purported misconduct by PNC in its lending

(continued...)

As noted earlier in this opinion, "[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Mezibov v. Allen*, 411 F.3d 712, 716 (6th Cir. 2005). "A proposed amendment is futile if the amendment could not withstand a Rule 12(b)(6) motion to dismiss." *Rose v. Hartford Underwriters Ins. Co.,* 203 F.3d 417, 420 (6th Cir. 2000). As the Proposed Amended Counterclaim is devoid of facts in support of the priority principle asserted in *Tile House*, leave to file proposed Count Ten will be denied as futile.

### 2.  Claims of KRS 286.8-220(2) Violations

Subtitle 8 of the Kentucky Financial Services Code governs practices of mortgage loan companies and brokers in Kentucky. Section 286.8-220(2)(a) and (b) provides:

> It shall be unlawful for any person, in connection with a transaction involving the mortgage lending process, or in connection with the operation of a mortgage loan business or the management or servicing of mortgage loans, directly or indirectly,
>
> (a) to employ a device, scheme, or artifice to defraud;
>
> (b) To engage in any act, practice, or course of business that operates or would operate as a fraud or deceit upon any person...

For purposes of Subtitle 8, "'Mortgage loan' means any loan primarily for personal, family, or household use..." As the loans in issue in this case are commercial construction loans, KRS

---

[10](...continued)
practices. As such, the allegations do not support the Benz/Fiorini's proposed claim.

[11]The Proposed Amended Counterclaim alleges at ¶ 16 that "Also as a condition of its $29 million commitment and more specifically as a precondition to any advancement of funds under that commitment, National City required *Seminary Woods* to presell condo units and to obtain deposits in connection with those sales. The end result was the creation of $5 million in equitable liens that are superior to the Bank's mortgage. *The liens include money spent by the Benzes and Fiorinis.*" (Emphasis added). This purported "factual allegation" is wholly conclusory, non-specific, and thus insufficient to undergird a claim by the Benz/Fiorinis to assert an equitable lien.

286.8-220(2) is inapplicable in this case. The claims alleging violations of this section will be dismissed and the filing of the Benz/Fiorini's Proposed Amended Counterclaim - Count Two will be denied as futile.

### 3. Claim of Violation of The Equal Credit Opportunity Act and Regulation B

The Benz/Fiorinis have moved for leave to amend their counterclaim to add a claim for violation of the Equal Credit Opportunity Act (15 U.S.C. § 1691, *et seq.* and its implementing regulation, Regulation B, 12 CFR Part 202. They claim in proposed Count Nine that:

> 104. The Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. §§ 1691-1691f and Regulation B, 12 C.F.R. § 202, prohibit a lender from requiring a personal guaranty based upon marital status alone. Instead, before a lender may require such a guarantee from a spouse, it must make an independent evaluation of its need for that guaranty. That is, it must consider the assets of each spouse independently and cannot blindly demand a guarantee based upon marital status. The Bank violated Regulation B by requiring Ms. Benz and Ms. Fiorini to sign a Guaranty Agreement and then to "reaffirm" based solely upon marital status.

> 105. The Bank has pleaded that Ms. Benz and Ms. Fiorini re-affirmed their guaranty agreements with the Bank in 2013 when they executed releases in connection with certain condominium unit sales. Although they both deny that they reaffirmed any valid, enforceable guaranty agreement, should this Court disagree, Ms. Benz and Ms. Fiorini alternatively plead here that the Bank's conduct violated Regulation B of the ECOA.

The sole factual allegation in support of this claim is found at paragraph 15 of the Proposed Amended Counterclaim[12]:

---

[12]The Benz/Fiorinis have also asserted this alleged violation of the ECOA and Regulation B as a proposed affirmative defense (Prop. Am. CC, Eighth Defense). The statute of limitations does not bar the filing of this affirmative defense for "recoupment" ("Recoupment claims are generally not barred by a statute of limitations so long as the main action is timely." *RL BB Acquisition, LLC v. Bridgemill Commons Development Group, LLC*, 754 F.3d 380, 387 (6th Cir. 2014)). However, the Benz/Fiorinis

(continued...)

Further, the Bank had blindly and apparently out of routine practice required Messrs. Benz's and Fiorini's spouses to execute guarantees without evaluating their wealth independent of Mr. Benz and Mr. Fiorini's or vice versa so as to determine if Mr. Benz's and Mr. Fiorini's individual wealth was substantial enough such that their personal guarantees standing alone sufficed to support their limited guaranty obligations.

Taking this allegation as true, it is insufficient to state a claim for violation of the ECOA and Regulation B upon which relief could be granted.

In *Ballard v. Bank of America, N.A.,* 734 F.3d 308 (4ᵗʰ Cir. 2013), a wife who alleged to have no ownership interest in her husband's food-packing company, brought suit for violation of the ECOA against the Bank of America for allegedly requiring her to serve as her husband's guarantor on a business loan.  The business defaulted on the loan and Mrs. Ballard and her husband entered into a number of debt restructuring agreements which were also defaulted.  The restructuring agreements contained a comprehensive waiver of "any and all claims –  past, present, or future – against Bank of America."  *Id.*  at 309.  After the last default, the bank recorded consensual liens on two properties co-owned by the Ballards.  Mrs. Ballard sought equitable, injunctive, and declaratory relief, and asserted a claim for unjust enrichment against Bank of America.

The court in *Ballard* noted that

The Equal Credit Opportunity Act makes it unlawful for "any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction on the basis of...marital status." 15 U.S.C. § 1691(a)(1)(2006).  Specifically, ECOA regulations prohibit lenders from requiring a spouse's signature on a loan agreement when the applicant individually qualifies for the requested credit.  12 C.F.R. § 202.7(d)(1)(2013) (lenders may not "require the signature of an applicant's spouse

---

¹²(...continued)

will not be permitted to file the proposed amended affirmative defense, as the claim is futile for the same reasons we have so found with respect to Proposed Count Nine.  (*See RL BB Acquisitions*, 754 F.3d at 388:  "Regulation B permits spouse-guarantors to sue for their actual damages from entering into an illegally required guaranty. *A recoupment defense simply allows the spouse-guarantor to recover these actual damages in a different procedural posture."*)(emphasis added).

> or other person, other than a joint applicant, on any credit instrument if the applicant qualifies under the creditor's standards of creditworthiness"). Congress enacted this prohibition to eradicate credit discrimination against married women, whom many creditors traditionally had refused to consider for individual credit. Not every signature required of a borrower's spouse, however, constitutes credit discrimination under ECOA. Rather, the statutory scheme provides for several exceptions permitting lenders to obtain the signature of a borrower's spouse on a loan agreement.

734 F.3d at 310. A spouse's signature may be required by a lender (1) when the borrower does not qualify alone for the amount and terms of the credit requested, (2) when the borrower's spouse owns or co-owns the entity benefitting from the loan as a "de facto joint applicant," and (3) when two spouses co-own property designated as collateral for a loan, "for purposes of creating a valid lien, passing clear title, waiving inchoate rights to property, or assigning earnings." *Id.* at 310-11.

In the case at bar, the Benz and Fiorini spouses alleged only that "the Bank had blindly and apparently out of routine practice required [them] to execute guarantees [sic] without evaluating [any of the Benzes' or Fiorinis' wealth independently of each other] so as to determine if Mr. Benz's and Mr. Fiorini's individual wealth was substantial enough such that their personal guarantees standing alone sufficed to support their limited guaranty obligations." (DN 119-1, ¶ 15).

In determining whether Count Nine could withstand a motion to dismiss, we note that under *Iqbal*, if the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has not shown the pleader is entitled to relief. 556 U.S. at 678. The court concludes that the bald statement above, without any additional context, is insufficient to state more than a mere possibility that the Bank could have violated the ECOA. There is a complete absence of allegations concerning the Benz and Fiorini wives and the guaranty they signed. There is no

allegation that Laurence Benz or Albert Fiorini qualified under the lender's standards of creditworthiness. They allege only that they failed to independently evaluate them so as to make such a determination.[13] Thus Proposed Count Nine fails to allege that the lender required the wives' signatures when their husbands individually qualified for the requested credit.

Additionally, they allege in Count Nine that they have "limited guaranty obligations." (DN 119-1, ¶ 15). A review of the Guaranty Agreement (DN 1-21) reveals that the Guaranty was one document which was signed by all of the guarantors and set forth limited guaranteed amounts for them. In particular, Laurence N. Benz and Patricia G. Benz are jointly and severally liable for no more than $5,296,200 and Albert E. Fiorini and Patricia A. Fiorini are jointly and severally liable for no more than $3,652,500. As there are no allegations concerning the Guaranty beyond the statement that it was procured apparently routinely, the claim states no more than a mere possibility that the lender violated the ECOA and Regulation B.

Further, in accordance with *Ballard*, the court finds that the ECOA claim is time-barred. The Benz/Fiorinis moved for leave to file their Proposed Amended Counterclaim on January 10, 2014. They did not include an ECOA claim in the original Counterclaim. The Guaranty Agreement was executed in 2006. The ECOA contained a two-year statute of limitations at the time the parties entered into the agreement. The statute was amended in 2010, extending the limitations period to

---

[13]We note that the United States Supreme Court recently granted certiorari to review *Hawkins v. Community Bank of Raymore,* 761 F.3d 937 (8th Cir. 2014), a case which declined to follow the Sixth Circuit case of *RL BB Acquisition, LLC, supra.,* addressing whether the term "applicant" could be construed to cover spouse-guarantors for purposes of challenging guaranties which they were required to execute in connection with loans for their husbands' business venture. The *Hawkins* court held that "applicant" does not include guarantors who, by definition, do not request credit, noting that it is only applicants who the ECOA protects from discrimination. The Sixth Circuit has taken a contrary position, finding that "applicant" as used in the ECOA is ambiguous, and the definition in the implementing regulation, Regulation B, which includes guarantors, is entitled to deference. Despite Supreme Court review of this issue slated for October 2015, *RL BB Acquisition* binds us, and thus permits the Benz/Fiorini wives' claim, absent any other basis for its preclusion.

five years.  (*See* Publ. L. No. 111-203, § 1085(7), 124 Stat. 1376, 2085 (2010); codified at 15 U.S.C. § 1691e(f)).  Under either limitations period, the statute clearly ran on the Guaranty Agreement long before any ECOA claim was raised.

Finally, the most compelling reason to decline the request for leave to amend is that any ECOA claim with respect to the Guaranty Agreement has been waived by the Benz/Fiorinis' subsequent course of conduct.

In *Ballard*, the Sixth Circuit noted that "[a] valid waiver can prevent a borrower from recovering under a federal statute," 734 F.3d at 313, and held that a valid waiver of Ms. Ballard's ECOA claim had occurred[14]:

> After FoodSwing's first default in 2009, however, Mrs. Ballard executed a series of four loan restructuring agreements.  Each of these restructuring agreements expressly waived "any and all" claims by Mrs. Ballard against Bank of America in exchange for the Bank's waiver of FoodSwing's defaults...A court will enforce a waiver unless it was obtained through intentional misconduct, [citations omitted]; was not knowing and voluntary, [citation omitted]; or would "thwart the legislative policy which [the statute] was designed to effectuate," [citation omitted]...[T]he Bank obtained Mrs. Ballard's waiver only in exchange for its agreement to restructure the loan after FoodSwing defaulted.  Thus, Bank of America agreed to work with the Ballards to resolve FoodSwing's defaults, but only if the Ballards consented to forfeit all past, present, and future claims against the Bank.  Conditioning a favorable loan restructuring upon a waiver of ECOA rights seems to us analogous to the common employment practice of conditioning a favorable severance agreement upon a waiver of Title VII rights...An ECOA waiver obtained in exchange for a loan restructuring differs significantly from one required as a precondition for a loan.  The latter would permit a bank to circumvent ECOA's clear dictates.  The former merely affords both parties a negotiated benefit: a means of escaping default for the borrower, and protection against future claims for the lender...Mrs. Ballard waived her right to bring an action against Bank of America, and thus her state and federal ECOA claims must fail.

734 F.3d at 313-14.

---

[14]The court in *Ballard* did not decide whether state or federal law applied in determining the validity of the waiver of a right under the ECOA.  Similarly, such a determination is not necessary to our decision.  As in *Ballard*, we find that under either the federal or state approach (*see* 734 F.3d at 313), a waiver of "any and all" claims is valid.

In the case at bar, the Benz/Fiorinis entered into amendments to the Note and Construction Loan Agreement, and reaffirmed the Guaranty in 2009 and 2010.  The also entered into Unit Releases in 2012 and 2013 which permitted the transfer of a number of condominium units, despite Seminary Woods' defaulted obligations.  The 2009 and 2010 amendments contained the provisions restated in full at p. 5 of this opinion which reaffirms their continuing obligations under the 2006 guaranty and releases

> any and all liability on account of any and all claims, demands, actions, or causes of action whether in law or in equity or otherwise, whether in contract or tort or pursuant to any statute, code, ordinance or regulation, whether direct or indirect, whether known or unknown, whether presently discoverable, whether suspected, unclaimed or claimed, including, without limitation  that class of claims popularly known as "lender liability" which the Borrower or Guarantor ever had, now has or may have against Bank arising out of or in any way related to loan transactions with Bank, loan requests to Bank, the Loan Documents, the negotiation and execution of this Agreement or relationships or transactions of any kind or nature involving the Bank, Borrower, and any Guarantor or their related entities or persons, employees, agents, affiliates successors or assignees.

DN 1-32, § 3.4.

For the reasons set forth in sections 5 and 6 below, the court concludes that the Benz/Fiorinis have failed to state a claim for fraud or other tortious conduct in the procurement of the  amended documents.   They acknowledge in the documents themselves that "adequate, sufficient good and valuable consideration, in the form of the Bank's waiver of the existing Event of Default, the extension of the Curtailment Dates and other valuable consideration, have been received from Bank for this release.  This section is set out in bold type to emphasize its importance to Bank as part of the consideration for this Agreement."  (DN 1-32, § 3.4).  The waivers were thus knowing and voluntary, and supported by appropriate consideration.  No contravention of legislative policy would occur in the enforcement of such properly procured waivers.

The Benz/Fiorinis urge in their reply brief (DN 136) that the ECOA/Regulation B claim seek to redress violations in connection with the Unit Release Agreements which contain reaffirmations of their guaranty agreements but do not contain waiver provisions which would preclude an ECOA challenge.

First, these releases are not applications seeking the extension of credit. Therefore, the ECOA and Regulation B simply do not apply.

We reject out-of-hand the Benz/Fiorinis' assertion that the definition of "extend credit" and "extension of credit" contained in Regulation B saves their claim with respect to the Unit Releases. If these agreements fall within the definitions contained in Regulation B as "the continuance of existing credit without any special effort to collect at or after maturity," (DN 136, p. 10), then they harken back to the original Guaranty and are time-barred. *See Mays v. Buckeye Rural Elec. Co-op., Inc.*, 277 F.3d 873(6th Cir. 2002)("Plaintiff joined Mays in signing the application for electrical service in 1987 [the original agreement]. Plaintiff's failed attempts in early 1998 to establish an electrical services account [the later agreement] *arose out of her owing money from the prior account, a result of the alleged discriminatory requirement that she sign the credit application in 1987*." ECOA/Regulation B claim time-barred). *Mays*, 277 F.3d at 880 (emphasis added). If, on the other hand, the Unit Releases are unrelated to the Guaranty, there can be no claim under the ECOA and Regulation B because the unit releases are not "applications for credit" and thus not subject to statutory protection under the ECOA.

For all of the reasons stated, the ECOA/Regulation B claim and affirmative defense are not viable in this case, and the proposed amendment of the Counterclaim to add them will be denied as futile.

4.  Claim for Lack of Compliance with KRS 371.065

The Benz/Fiorinis allege that they state a viable affirmative defense (plead as the Fourth

Defense in both the Answer and Counterclaim (DN 107) and Proposed Amended Answer and

Counterclaim (DN 119-1) that the Guaranty Agreement is void *ab initio* and therefore unenforceable

against them.  (DN 119).  They have also moved for summary judgment in the case on this same

ground (DN 157).

The guarantors rely upon the case of *Guangzhou Consortium Display Product Co., Ltd. v.

PNC Bank, National Association*, 956 F.Supp.2d 769 (E.D.Ky. 2013) in which the United States

District Court for the Eastern District of Kentucky found that PNC Bank's non-compliance with the

so-called "reference requirement" of KRS 371.065 rendered the guaranties in issue void *ab initio*

and thus unenforceable.

KRS 371.065 provides, in pertinent part:

> No guaranty of an indebtedness which is not written on, or does not expressly refer
> to, the instrument or instruments being guaranteed shall be valid or enforceable
> unless it is in writing signed by the guarantor and contains provisions specifying the
> amount of the maximum aggregate liability of the guarantor thereunder, and the date
> on which the guaranty terminates.

In *Guangzhou*, the court noted that the statute "is a consumer-protection provision designed

to protect the guarantor by reducing the risk of the guarantor agreeing to guarantee an unknown

obligation."   956 F.Supp.2d at 791, *quoting Wheeler & Cleavenger Oil Co. v. Washburn*, 127

S.W.3d 609 (Ky. 2004).  The guaranties in *Guangzhou* were so broad and vague that they could not

be found to "expressly refer" to the instruments guaranteed.  The district court predicted that the

Supreme Court of Kentucky would likely hold that the statute's requirements are not waivable.  The

court explained that if the reference requirement were found to be waivable, it would permit lenders

- 22 -

to avoid the statute's requirements by inserting a "catch-all" waiver in all of its guaranties.  *Id.* at 793.[15]

The facts before this court are markedly different from those in *Guangzhou*.  Here, the Benzes and the Fiorinis, represented by counsel, each executed a letter agreement on March 17, 2006 containing the following pertinent provisions:

> As you know, I am a guarantor of certain obligations under the Loan,[16] and I am required to sign certain documents related to such Loan.  I anticipate being unavailable at the time of the closing of the Loan, and have requested that the Bank permit me to sign documents in advance of closing.  The applicable Loan documents are as follows:
>
>  1. Construction Loan Agreement;
>  2. Guaranty of Payment;
>  3. Guaranty of Completion;
>  4. Environmental Indemnity Agreement; and
>  5. Side Fee Letter.
>
> I understand that notwithstanding my signature on these documents, they are not yet final and are subject to change...I understand that your [NCB's] counsel, Greg Ehrhard, will hold these executed documents in escrow until the closing.  If any changes to these documents occur while they are held in escrow, Mr. Ehrhard will notify my attorney, John Talbott, of such changes.  I will discuss those changes with Mr. Talbott.  Mr. Talbott will contact Mr. Ehrhard regarding any questions or concerns I may have regarding such changes.  You are authorized to accept Mr. Talbott's legal opinion regarding my execution and delivery of the documents as conclusive evidence of my review, understanding and acceptance of any such changes and my execution and delivery of the documents as modified.

---

[15]PNC has indicated that it is not presently claiming that the Benz/Fiorinis waived their rights under the guaranty statute. (DN 161, p. 10, n. 12).  Rather, it contends that the Benz/Fiorinis, who did not attend the closing, instead authorized their attorney to accept the terms of the agreement as finally drafted, and authorized the bank to accept counsel's opinion letter thereon as conclusive evidence of the Benz/Fiorinis' understanding, acceptance and execution of the Guaranty.  We note, however, that an argument concerning waiver under the facts herein might lead to a different result from that reached in *Guangzhou*.  Waivers of all claims by the Benz/Fiorinis were executed herein with consideration and were made simultaneously with the reaffirmation of the term of the Guaranty.  To date, the Kentucky Supreme Court has not held that claims under KRS 371.065 are not waivable under any circumstances.

[16]"Loan" is identified in the subject line of the letter as the Proposed $29,220,000 Loan from NCB to Seminary Woods.

DNs 129-2, 129-3, 129-4, and 129-5.

The Guaranty Agreement document they signed prior to the closing[17] listed the maximum aggregate liability of each of the guarantors,[18] and stated that "This Guaranty Agreement shall terminate on _____ [one year from maturity]..." (DN 120-1, p. 4).  The Guaranty Agreement executed at the time of closing by the Benz/Fiorinis' attorney, permissibly,[19] in their absence, contained the maximum aggregate liability of the guarantors and stated that "This Guaranty Agreement shall terminate on April 18, 2010..."  (DN 129-7, p. 4).

The Benz/Fiorinis urge that the blank in the document signed earlier by them (DN 120-1) renders the Guaranty Agreement non-compliant with KRS 371.065 and therefore void *ab initio*. However, the fallacy of that argument is evidence by the language in the guarantors' March 17, 2006 letter agreements which accompanied their signatures.  They stated unequivocally that "notwithstanding [their] signature[s] on these documents, *they are not yet final and are subject to change."*  The guarantors do not argue that the date inserted in the final document is not one year from maturity, as represented in the document they signed.  Therefore, no change in that term is evident.

However, were the insertion of a precise date be deemed a "change" to the document, the guarantors authorized the bank "to accept Mr. Talbott's legal opinion [which he indisputably

---

[17]This version of the guaranty is not the document upon which PNC's claims against the Benz/Fiorinis are based.  Rather, PNC relies upon the Guaranty Agreement which was executed at the closing and upon which the Benz/Fiorinis' attorney premised his opinion letter.  The Guaranty Agreement is one single document that bears the signatures of all of the guarantors.

[18]In particular, Laurence N. Benz and Patricia G. Benz in the sum of $5,296,200, and Albert E. Fiorini and Patricia A. Fiorini in the sum of $3, 652, 500.

[19]*Lattanzio v. Ackerman*, 682 F.Supp.2d 781, 788 (E.D.Ky. 2010)("Under Kentucky law, the acts taken by an attorney for the benefit of his client are those of an agent for his or her principal.  *Daugherty v. Runner*, 581 S.W.2d 12, 16 (Ky.App. 1978); *Ball v. Stalnaker*, 517 F.Supp.2d 946, 950 (E.D.Ky. 2007)...[A]t all relevant times, acting...as attorney-in-fact,...claims were therefore released through execution of the Mutual Release.")**.**

provided] regarding [each guarantor's] execution and delivery of the documents *as conclusive evidence of my review, understanding and acceptance of any such changes and my execution and delivery of the documents as modified*."  (DNs 129-2, 129-3, 129-4, 129-5).

While the guarantors note that counsel was required to discuss any changes to the documents with them, any failure on the part of Mr. Talbott to do so (although none has been suggested) would have no bearing on the authorization provided by the Benz/Fiorinis to the bank to accept Mr. Talbott's letter as conclusive evidence of their review, understanding, acceptance, execution, and delivery of the final documents.

The Benz/Fiorinis urge that, in keeping with the purpose of the statute, the Guaranty Agreement should be declared void because the bank *could have* inserted an arbitrary termination date.  They contend that a statement in the Talbott opinion letter (DN 129-6, p. 4) that the enforceability of the loan documents "may be limited by state law" preserves their ability to challenge the Guaranty Agreement for lack of a termination date.  We reiterate that the Guaranty Agreement executed by the Benz/Fiorinis contains the maximum aggregate amount owed by them and a termination date.  Their argument is without merit.

Finally, we note that there is nothing about this guaranty commitment that would suggest an "unknown obligation" warranting protection from overreaching.  In *Guangzhou*, the court distinguished the sweeping and unbounded guaranties before it from those in *Banterra Bank,* No. 5:09-CV-00012-TBR, 2011 WL 832455 at *9 (W.D.Ky. March 3, 2011) wherein the court found that "the guaranty's language, "[w]hile perhaps not as exact as this Court might like," satisfied the statute's reference requirement.  *Id.*  Similarly, in *Buridi v. Leasing Group Pool II, LLC*, 447 S.W.3d

157 (Ky.App. 2014), in concluding that the requirement was satisfied by reference to leases which came into existence after the guaranties were signed, the Kentucky Court of Appeals stated:

> Few cases interpret KRS 371.065, but those that do recognize its goal is to "reduce the risk" a consumer will agree to an unknown obligation – not to "eliminate" all unknown obligations.   *Alliant Tax Credit Fund 31-A, Ltd. v. Nicholasville Community Housing, LLC*, 663 F.Supp.2d 575, 582 (E.D.Ky. 2009)(citing *Wheeler*, 127 S.W.3d at 615 and collecting cases).   Thus, our overall inquiry is whether the guaranties provided the doctors – sophisticated and learned individuals – sufficient detail to know the breadth of the obligation they were accepting before they signed. We believe they did...[T]he leases were finalized after the guaranties were signed, making the lease numbers unknown to the doctors at the time of execution.  Even so, because the doctors voluntarily signed the guaranties without benefit of having seen the actual leases, it is highly doubtful the mere lease numbers would have held much value for the doctors...[W]e believe the doctors knew full well the obligation to which they bound themselves by signing the guaranties and had sufficient details upon which to calculate the risk being undertaken...[I]t would be disingenuous for the doctors to now claim they did not know the guaranties secured the leases being negotiated between, and subsequently executed by, KMC and LGP.

447 S.W.3d at 172-173.  We find nothing comparable as between this case and *Guangzhou*.  In *Guagzhou*, the guarantor did not request to provide his signature in advance of closing nor knowingly sign a draft of a guaranty which was not final.

The motion of the Benz/Fiorinis for leave to add an affirmative defense grounded in a purported violation of KRS 371.065 will therefore be denied.

### 5.  Fraud/Fraudulent Inducement/Fraudulent Omissions Claims

#### (a)

The contracting parties' claims of fraud in various forms is that NCB initially, and PNC thereafter, promised to offer End User Financing ("EUF") to prospective purchasers of

condominium units, but failed to do so.  They urge that NCB and PNC did not intend to provide an EUF program.  They contend that PNC continued to reassure them that an EUF program would be forthcoming, and concealed from the defendants that it did not intend to provide such a program in the future.  The defendants claim that they relied upon the promise that an EUF program would be offered in deciding to enter into the Construction Loan Agreement, Note, and Guaranty, and that therefore these purportedly fraudulent statements and omissions render the agreements unenforceable.

The defendants asserted various fraud allegations in their initial counterclaims, and seek to further develop those claims with additional detail in their proposed amended versions.  However, despite additional detail and much rhetoric, the cornerstone of the fraud claims remains the same throughout the documents and is foundationally deficient.  For this reason, further amendment of the claims will be denied as futile and the existing counterclaims for fraud will be dismissed.

In assessing whether a viable claim for fraud has been alleged, the court must take the facts plead as true, but the court is not bound to accept legal conclusions or bald assertions.  *Iqbal,* 556 U.S. at 687 (*quoting Twombly*, 550 U.S. at 557))  "[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Mezibov v. Allen*, 411 F.3d 712, 716 (6th Cir. 2005).  Neither the current nor the proposed amplified counterclaims state a viable claim for fraud, as the allegations suggest nothing more than unenforceable promises or opinions of future events.  Such statements (1) do not establish actionable fraud, (2) do not constitute enforceable obligations, and (3) in this instance, as there is no actionable fraud which operates to vitiate the agreements, all other tort - and contract-based claims alleging

wrongful conduct by PNC in making such statements are precluded by the reaffirmations and waivers contained in those agreements.

(b)

The defendants correctly state that a release procured by fraud is unenforceable. *Humana v. Blose*, 247 S.W.3d 892 (Ky. 2008). Fraud vitiates everything. In *Radioshack Corp. v. ComSmart, Inc.*, 222 S.W.3d 256 (Ky.App. 2007). Judge Wine quoted *Veterans Service Club v. Sweeney*, 252 S.W.2d 25, 27 (Ky. 1952), which held "it is a stern but just maxim of law that fraud vitiates everything into which it enters." *Id*. at 260.

In *Our Lady of Bellefonte Hospital, Inc. v. Tri-State Physicians Network, Inc.,* No. 06-141-HRW, 2007 WL 2903231 (E.D.Ky. Sept. 27, 2007), Our Lady of Bellefonte Hospital ("OLBH") filed suit against the Tri-State Physicians Network ("TSPN") for breach of a number of physician recruitment and line of credit agreements by failing to maintain privileges and offices at OLBH. TSPN counterclaimed in response to the claimed events of default.

> In its Counterclaim, TSPN contends that OLBH represented that it intended to purchase River Valley Hospital, a defunct facility..., renovate it, and reopen it as an urgent care center and that OLBH also intended to open additional outpatient facilities...TSPN alleges that OLBH represented that it intended to give TSPN an exclusive services agreement for TSPN to provide the physicians and medical personnel to staff the...facilities. The Counterclaim further alleges that TSPN incurred costs and obligations in reliance on OLBH's promises and seeks to recover those costs. Specifically, TSPN claims it lacked the funds to continue to pay the salaries of the subject doctors, but OLBH persuaded TSPN to keep these doctors in its employment by agreeing to provide financial assistance in paying the salaries. Moreover, TSPN claims that three doctors were recruited and hired solely for the purpose of having the physicians available to staff the...facilities. TSPN alleges that but for OLBH's assurances, it would not have entered the physician recruitment and revolving line of credit agreements, which for the basis of OLBH's Complaint. Although these claims are not reflected in the written agreements, TSPN nonetheless

- 28 -

> asserts that it is OLBH that breached these contemporaneous agreements, and that
> the hospital is not entitled to enforce the written agreements.

*Id.* at *1.

In addressing OLBH's motion to dismiss the counterclaim, the court found that although extrinsic evidence is admissible to establish a separate or contemporaneous agreement which is not inconsistent with a written agreement, the oral promises allegedly made by OLBH to TSPN did not amount to a separate agreement. First, the court noted that these promises or representations did not allege an enforceable oral agreement, as there were no definite and certain terms, there was no consideration for the purported promises, nor was there a specified time for anyone to act on such promises. Second, even if such non-specific oral promises articulated a contract, it would be unenforceable under the Statute of Frauds, as the promises involved the lending of money. Finally, the court found that the alleged oral promises did not constitute a separate agreement, but rather found that they were admittedly the reason, or inducement, for TSPN to enter into the written agreements, as TSPN itself alleged that it would not have entered into the written agreements without such promises. Therefore, the purported oral representations contradicted the written agreements which contained a merger clause and did not contain any reference to the purported oral promises. The court thus concluded that TSPN failed to state a viable counterclaim for breach of contract. *Id* at *2 – 4.

In *Fifth Third Bank v. Waxman*, 726 F.Supp.2d 742 (E.D.Ky. 2010), defendant Waxman asserted that certain guaranties should not be enforced against her, as Fifth Third Bank purportedly breached the parties' "overarching agreement" that their written guaranties would not be enforced. Waxman claimed that this alleged agreement was being introduced to connect all of the loan

agreements between the parties and to show that they were part of one larger transaction.  The court

found that

> Under Kentucky law, oral agreements or representations cannot be proved or relied
> upon if they contradict a positive provision of the written contract. *Mario's Pizzaria,*
> *Inc. v. Fed.  Sign & Signal Corp.*, 379 S.W.2d 736, 739 (Ky.App. 1964).  More
> recently, the Kentucky Court of Appeals held that "as a matter of law, a party may
> not rely on oral representations that conflict with written disclaimers to the contrary
> which the complaining party earlier specifically acknowledged in writing."
> *Rivermont Inn, Inc. v. Bass Hotels Resorts, Inc.,*  113 S.W.3d 636, 640-41 (Ky.App.
> 2003).  Here, the terms of the guaranties that Debra Waxman executed clearly
> contradict the terms of the alleged "overarching agreement" between the parties.

*Id.* at 751.

Additionally, we note the following authority concerning the establishment of actionable

fraud:

In the recent case of *Crestwood Bloodstock v. Everest Stables, Inc.,* 751 F.3d 434 (6th Cir. 2014), a

"breeders' quarrel" between two thoroughbred horse operations over various agreements concerning

the reproduction, care, and sale of racehorses, the Sixth Circuit stated

> Also unavailing is Everest's fraud claim.  To establish fraud, a claimant must show
> that it reasonably relied on a representation that was material, false, known to be
> false or recklessly made, and made with the intent of inducing another to act or
> refrain from acting.  *See Ross v. Powell*, 206 S.W.3d 327, 330 (Ky. 2006).  A claim
> for fraud under Kentucky law also "must relate to an existing or past fact.  If the
> alleged misrepresentation relates to a future promise or an opinion of a future event,
> then it is not actionable." *Radioshack Corp. v. ComSmart, Inc.*, 222 S.W.3d 256, 262
> (Ky.App. 2007)(citations omitted).  No fraud occurred.  Everest bases its claim on
> Crestwood's promise to "increase [its] efforts to sell Petionville [breeding] seasons,"
> App. Br. at 35 – to "take Petionville to the next level," R. 204 at 20.  Everest
> contends that Crestwood made these promises "with no present intention to actually
> perform" them.  App. Br. at 35.  But allegations of this ilk are not actionable.  The
> statements sound more like "future promise[s] or...opinion[s] of a future event" than
> "false" representations of fact.  *See Radioshack Corp.*, 222 S.W.3d at 262.

- 30 -

751 F.3d at 444.  *See also , Rivermont Inn,* 113 S.W.3d at 640*; Cox v. Owen*, 452 S.W.3d 137 (Ky.App. 2014).

(c)

The operative factual allegations contained in the Proposed Second Amended Counterclaim (DN 232-2) of Seminary Woods[20] are as follows:

(1)  On October 4, 2005 all of the National City employees present [at the meeting] indicated National City's willingness and intent to provide EUF through National City Mortgage for prospective condominium purchasers.  ¶¶ 18, 19.

(2)  Mr. Rowe and Ms. Hood [of National City] indicated they would be assembling an EUF program, but in fact had no intention to provide EUF to prospective purchasers. ¶ 20.

(3)  Seminary Woods agreed to move forward based upon the representations that National City would, when individual units were available for sale, provide EUF to unit purchasers.

(4)  In discussions in 2006 and 2007 National City reiterated its intent to make an EUF program available.  ¶ 28.

(5) On December 28, 2007, Nancy Oyler [of National City] indicated that National City was working on an EUF program.  ¶ 29.

---

[20]The allegations offered by the Benz/Fiorinis essentially parallels Seminary Woods' allegations with respect to claims of fraud.

(6)  From 2008 through 2011, National City and then its successor by merger, PNC, continued to reiterate their intentions to provide EUF and that an EUF package would be forthcoming.  ¶¶ 32, 36, 38, 41, 42, 45, 51, 54, 57, 58, 60, 65, 67, 74.[21]

(7)  On December 28, 2011, PNC presented the defendants with a proposed EUF program. ¶ 79.

The contracting parties allege that the false promise of a forthcoming EUF program for condominium purchasers fraudulently induced them to enter into the Construction Loan Agreement, Note, Guaranty Agreement, and the numerous amended versions of these documents which extended the maturity dates of the original agreements, and operated in forbearance of action on the default. They urge that none of the agreements is enforceable against them.

The contracting parties' claims are patently insufficient, as a promise of future performance cannot form the basis of a claim of fraud.  *Radioshack Corp., supra.*  They urge that it was customary in the industry to offer EUF programs.  They urge that an EUF program was the cornerstone of the project's success, and that the failure to provide such a program [prior to the allegedly inadequate program which was proposed in December 2011] caused their default on the loan, caused them to forego pursuit of other financing options, and forced them into reaffirming their obligations in order to forestall foreclosure.  The fatal flaw in their argument is that none of the representations related to existing or past fact.  Rather, they related to a promise of future performance.  They describe an intention to put a wholly undefined "program" in place at some

---

[21]These paragraphs are distilled to their essence - the repeated expression of the intention to offer an EUF package to prospective purchasers in the future.  None of the embellishments concerning the bank's purpose in offering such reassurances nor the extensive commentary concerning the financial crisis and the merger of NCB into PNC alter the representations in any way. Thus, these details are not discussed here.

future time for the benefit of potential future purchasers of as yet unconstructed condominium units. On these facts, any reliance on such representations in entering into the agreements with PNC is not, as a matter of law, the result of fraudulent inducement.

In order to state a claim of fraud by omission, the contracting parties must allege that PNC had a duty to disclose a material fact, that it failed to disclose that fact, that PNC's failure to disclose the fact induced the contracting parties to act, and that they suffered actual damages as a result. *Republic Bank & Trust Company v. Bear, Stearns & Co., Inc.*, 707 F.Supp.2d 702, 710 (W.D.Ky. 2010), *citing Rivermont Inn*, 113 S.W.3d at 641; *United Parcel Service v. Rickert*, 996 S.W.2d 464 (Ky. 1999).

Count Two of Seminary Woods' Amended Counterclaim and Count One of the Benz/Fiorinis' Proposed Amended Counterclaim[22] allege that PNC withheld information that it could not and did not intent to provide EUF. Such representations cannot constitute fraudulent omissions under the facts alleged. "A duty to disclose facts is created only where a confidential or fiduciary relationship between the parties exists, or when a statute imposes such a duty, or when a defendant has partially disclosed material facts to the plaintiff but created the impression of full disclosure." *Rivermont Inn,* 113 S.W.3d at 641, *citing Dennis v. Thomson*, 43 S.W.2d 18 (Ky. 1931). The claims do not identify any duty on the part of PNC to make such disclosures. The Agreements contain no reference to any EUF program existing or forthcoming, and the parties acknowledge that the documents are fully integrated. There is no confidential or fiduciary relationship here, nor is there evidence that there was a partial disclosure of material fact, as no EUF program was contemplated in the agreements nor any actionable promise made to provide such. As

---

[22]The Proposed Second Amended Counterclaim of Seminary Woods abandons the Fraudulent Omissions claim. The Benz/Fiorinis' original counterclaim did not contain a claim for fraudulent omissions.

noted in *Republic Bank*, 707 F.Supp.2d at 710, "The gravamen of the tort is breach of a duty to disclose, such that the plaintiff is injured by relying on the defendant to have fulfilled his duty. Again, however, the plaintiff's reliance must have been reasonable; he still must exercise common sense to protect himself." There can be no reasonable reliance on an unenforceable promise of future conduct which the parties did not made part of any agreement.

Additionally we note that, similar to the facts in *Our Lady of Bellefonte Hospital*, the contracting parties here urge that they relied upon oral promises as necessary terms of their agreement, yet these terms were not included in the integrated documents. The oral statements were found to contradict rather than supplement the terms of the agreements. *See also Waxman, supra.* We find that the same contradiction exists here.

We note that *Hanson v. American National Bank & Trust* Co*., 865 S.W.2d 302 (Ky. 1993), a case heavily relied upon by the contracting parties, does not counsel a contrary result. That case involved contracting parties who were induced to signing a contract without reading it. *Id.* at 307. *See also*, *Branch Banking and Trust Co. v. Thompson*, No. 2009-CA-001427-MR, 2011 WL 255149, *22 (Ky.App. Jan. 28, 2011)(distinguishing *Hanson* and others). Such is certainly not the case here.

For the reasons stated, the claims for fraud, fraud in the inducement, and fraud by omission will be dismissed from Seminary Woods' Amended Counterclaim and the proposed filing of such claim by the Benz/Fiorinis will be denied as futile.

6. Economic Duress Claim

Seminary Woods claims that it was under economic duress at the time of the execution of the of the various modified loan documents.  It contends that (1) PNC used "bait and switch" tactics in procuring loan terms; (2) there was a lack of consideration for the modified loan documents; and (3) the totality of the circumstances evidences that Seminary Woods executed the various modified loan documents under economic duress.  (DN 56, ¶¶ 80-81).  It abandons this claim in its Proposed Second Amended Counterclaim, and for good reason.  The Amended Counterclaim fails to state a claim for economic duress upon which relief can be granted.

The "totality of the circumstances" which Seminary Woods contends caused economic duress begins from the same premise as most of its other claims.  It contends that, in October 2008 Seminary Woods was in serious financial condition due to the result of National City's failure to provide end user financing that it had promised.  (DN 85, p. 18).  The court has found that PNC made no enforceable promise nor any representation that could support a claim of fraud with respect to end user financing.  Seminary Woods' financial condition prior to the original maturity date may have been the result of any number of circumstances, but it was not, as a matter of law, as a result of a breach of promise to provide an EUF program.  *See id.*  Reliance on the prospect of financing for condominium purchasers at some time in the future is simply not actionable as duress, as such resulting circumstances are borne of Seminary Woods' own business decisions.  A plaintiff asserting a claim for economic duress, must show something more than a "difficult bargaining position or the pressure of financial circumstance."  *Resolution Trust Corp. v. Ruggiero*, 977 F.2d 309, 313 (7th Cir. 1992) and cases cited therein.  In considering the question of voidability of an agreement on the ground of economic duress, the question is not whether the defendant drove a hard bargain, but

- 35 -

rather whether there was overreaching.  *See, Adams v. Philip Morris, Inc.*, 67 F.3d 580, 583 (6th Cir. 1995); *Ruggiero*, 977 F.2d at 313-14 (collecting cases).

The modified loan agreements contain a waiver provision the effects of which Seminary Woods seeks to avoid.  In Kentucky, several factors are considered in assessing whether a waiver should be voided on the ground of duress:  (1)  the plaintiff's experience, background, and education; (2) the amount of time the plaintiff had to consider whether to sign the waiver, including whether there was an opportunity to consult with a lawyer; (3)  the clarity of the waiver; (4) consideration for the waiver; (5) the totality of the circumstances.  *Adams*, 67 F.3d at 583.

Seminary Woods does not assert that the contracting parties lacked the experience, the background or the education to adequately assess their options and make informed business decisions. Seminary Woods does not urge that the waiver lacked clarity.  Rather, it urges that PNC delayed, changed counsel, and changed the terms of the modified loan agreements to its detriment, and continued to assure it that PNC would negotiate an EUF package.  (DN 56, ¶¶ 25-35.  Seminary Woods urges that it would never have agreed to the modified terms in arms-length negotiations. (DN 56, ¶ 35).  The three opinion letters from Seminary Woods' counsel in 2006, 2009 and 2010 (DN 65) belie the allegation that any of these transactions was not freely negotiated at arms-length. These letters indicate that counsel is not aware of any circumstances which would raise a question that there was any misunderstanding, fraud, duress or undue influence with respect to the procurement of the documents.  *Id.*

The court concludes that the allegations of economic duress derive from an untenable ground - that Seminary Woods' economic predicament which rendered it unable to pay off its loan commitment in 2009 can be attributable to wrongful conduct by PNC.  The remaining allegations

concerning the negotiation process and modified terms with which Seminary Woods was purportedly dissatisfied fail to state a viable claim for economic duress, as the stress of business conditions not properly attributable to PNC cannot form the basis of an economic duress claim. *See, McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89 (5th Cir. 1995)("Neither [lender] nor [borrower] could foresee or control Fannie Mae's dissatisfaction with the...loan, or the guidelines change, both of which materially altered the atmosphere surrounding the loans...[borrower] failed to show imminent threat that destroyed his free will and against which he had no present means of protection.").

Further, Seminary Woods' own counsel's opinion letters refute the unsupported conclusion in its counterclaim that these agreements were not reached freely and as a result of arms-length negotiations. *See, McCallum Highlands*, 66 F.3d at 93 (15mo. delay in raising a claim of duress in addition to the existence of a negotiated agreement between parties represented by counsel is compelling evidence that there was no duress).

For these reasons, the allegations of economic duress fail to state a claim upon which relief can be granted, and the claim will be dismissed.

7.  Breach of Contract and Breach of Duty of Good Faith Claims

The contracting parties urge that PNC did not negotiate fair loan extensions and contract modifications.  These claims are waived by the explicit language incorporated into those very agreements:

3.4  **Release.  Borrower and each Guarantor hereby fully and forever release, acquit, and discharge Bank, its affiliates, subsidiaries, shareholders, directors, officers, employees, servants, representatives, agents, attorneys, and other persons acting on behalf of any of the foregoing, and the heirs, representatives,**

**successors and assignees of each of them from any and all liability on account of any and all claims, demands, actions, or causes of action whether in law or in equity or otherwise, whether in contract or tort or pursuant to any statute, code, ordinance or regulation, whether direct or indirect, whether known or unknown, whether presently discoverable, whether suspected, unclaimed or claimed, including, without limitation that class of claims popularly known as "lender liability" which the Borrower or Guarantor ever had, now has or may have against Bank arising out of or in any way related to loan transactions with Bank, loan requests to Bank, the Loan Documents, the negotiation and execution of this Agreement or relationships or transactions of any kind or nature involving the Bank, Borrower, and any Guarantor or their related entities or persons, employees, agents, affiliates successors or assignees. The Borrower and Guarantors represent, warrant, and acknowledge that adequate, sufficient good and valuable consideration, in the form of the Bank's waiver of the existing Event of Default, the extension of the Curtailment Dates and other valuable consideration, have been received from Bank for this release. This section is set out in bold type to emphasize its importance to Bank as part of the consideration for this Agreement.**

The release is clear, conspicuous and comprehensive. The contracting parties do not challenge the effectiveness of the release, *per se*, to defeat PNC's claims. Rather, they challenge that the agreements in which the release appears are void due to fraud and voidable due to economic duress. The court has determined that the contracting parties have failed to state a viable claim of fraud or economic duress. Thus the release is effective to preclude later breach of contract claims and claims for violation of the duty of good faith and fair dealing. *Humana, Inc. v. Blose*, 247 S.W.3d 982, 896 (Ky. 2008)(A release is a discharge of a claim or obligation and surrender of a claimant's right to prosecute a cause of action, statutory or otherwise).

The contracting parties also urge that PNC breached a contractual duty, albeit an oral one, to provide EUF. The court has found that the purported oral promise to provide EUF (1) is unenforceable; (2) does not contain any of the requisite terms of a contract; and (3) is not in writing and thus fails to comply with the Statute of Frauds. KRS 371.010(9). Further, the merger and

- 38 -

integration clause in the original documents and carried forward in the modified documents precludes a claim for breach of the duty of good faith with respect to negotiation of an EUF program which is not a term of the written integrated agreements and which is not enforceable otherwise, for the reasons already stated.

Although we have found that the claims for breach of the covenant of good faith and fair dealing are  waived by the releases in the modified loan documents, such a claim also fails with respect to the releases of Units 603 and 903 which do not contain a provision waiving claims.  The Unit Release Agreements recite, and Seminary Woods does not dispute, that the primary Note matured and remains unpaid.  (DN 1-33, p. 1).  PNC thus had the full panoply of rights upon default. Seminary Woods has failed to identify any duty owed to a debtor in default or a principle limiting the rights of a lender in protecting its financial position.  "An implied covenant of good faith and fair dealing does not prevent a party from exercising its contractual rights."  *Hunt Enterprises, Inc. v. John Deere Indus. Equipment Co.,*  162 F.3d 1161 (6th Cir. 1998); *Farmers Bank & Trust v. Willmott Hardwoods*, 171 S.W.3d 4, 11 (Ky. 2005).

There being no sufficient basis in fact alleged to state a claim for breach of contract or breach of the duty of good faith, those claims will be dismissed.


### 8.  Negligent Misrepresentation Claim

The contracting parties urge that PNC negligently misrepresented that it intended to negotiate and offer EUF for condominium purchasers in the future.  As stated in *PCR Contractors, Inc. v. Daniel*, 354 S.W.3d 610, 618-19 (Ky.App. 2011),

> Negligent misrepresentation is a "lesser included" claim; it differs from fraudulent misrepresentation only in that, while the latter requires knowledge that the statement

was false, the former merely requires that the person who made the statement failed to exercise reasonable care or competence to obtain or communicate true information...§ 552 [of the Restatement (Second) of Torts] does not, by its terms, apply to misrepresentation of intention to perform an agreement. Nor do the illustrations to § 552 apply to other than typical cases of misrepresentation of factual, commercial information. The comments to § 530 specifically state that where there is no viable action on the contract, the exclusive remedy for misrepresentation of intention to perform an agreement lies in the action for deceit...A merely negligent misrepresentation of a maker's own intention is not actionable under § 530 for the reason that in the absence of any fraudulent intent...there is no misrepresentation of any existing fact on which any action for negligent misrepresentation could be based.

We thus conclude that the contracting parties have failed to state a claim for negligent misrepresentation upon which relief can be granted. They have urged only that PNC negligently misrepresented its intention to negotiate and provide EUF. The court having determined that there can be no finding of fraud, as a matter of law, for a future promise or opinion of a future event, there is no actionable negligent misrepresentation alleged.

We do not find *Presnell Construction Managers, Inc. v. EH Construction, LLC*, 134 S.W.3d 575 (Ky. 2004), a case principally relied upon by the contracting parties, to be inapposite. *Presnell* involved three parties to a project - Presnell, the construction manager; EH Construction, a "general trades" contractor; and DeLor, the commercial property owner. DeLor contracted with Presnell to act as the construction manager for renovation of the building. Because Presnell allegedly provided "faulty information and guidance" to the project's contractors, EH sought to recover economic losses from Presnell. After adopting § 552 of the Restatement (Second) of Torts, the Supreme Court of Kentucky found that the contractual duties Presnell owed to DeLor did not preclude additional tort duties to EH, particularly the duty not to supply false information to EH. Thus the court recognized a separate claim of negligent misrepresentation by EH as against Presnell.

In the case at bar, the court has found that no enforceable promise to offer EUF to prospective condominium purchasers was made. There being no actionable fraud alleged, a claim for negligent misrepresentation fares no better under these circumstances. Unlike the *Presnell* case where there were differing duties to different parties, here the defendants simply seek to repackage the same claim. The foundation for such a claim is deficient, however.

The claim for negligent misrepresentation will be dismissed. As there can be no liability as a matter of law, leave to amend to add such a claim will also be denied as futile.

### 9. Claims for Tortious Interference with Contract and with Prospective Business Advantage

Seminary Woods claims that PNC tortiously interfered with its contracts and with its prospective business relationships by failing to provide EUF for contract holders and for prospective condominium purchasers.

The Amended Counterclaim and the Proposed Second Amended Counterclaim recite facts concerning contracts or proposed contracts entered into after June 1, 2010 to support their claims of tortious interference. *See* DN 56, ¶ 44; DN 232-2, ¶ 60. These claims are waived by the release contained in the Second Amendment to Note and Tenth Amendment to Loan Agreement executed September 19, 2009 which precluded any and all claims, past, present and future, against PNC in connection with this "series of transactions." DN 1-31, § 4.4. As the modified loan documents have been found enforceable by this court, these adjunct tort claims must be dismissed for failure to state a claim upon which relief may be granted.

Additionally, a claim for tortious interference with contract requires a showing of intentional and improper interference with the performance of a contract. *Harrodsburg Indus. Warehousing, Inc. v. MIGS, LLC*, 182 S.W.3d 529 (Ky.App. 2005). As noted in *National Collegiate Athletic Association v. Hornung*, 754 S.W.2d 855, 859 (Ky. 1988) with respect to prospective business relationships, "a party seeking recovery must show malice or some significantly wrongful conduct...if the defendant has a legitimate interest to protect, the addition of a spite motive usually is not regarded as sufficient to result in liability."

Seminary Woods has failed to allege anything more than that PNC failed to follow through on its intended plan to offer EUF until it was too late,[23] and that when it did offer an EUF program, it did not propose terms that were palatable to Seminary Woods or prospective purchasers. Seminary Woods contends that PNC desired the project to fail. However, the reality is that PNC had no enforceable obligation to provide an EUF program, or if it did so, to provide one at any particular time or under any particular terms. There is a complete absence of facts to support the tortious interference claims.

Further, Seminary Woods does not deny that it failed to make the required curtailment payments by June 1, 2010, and that Seminary Woods has been and remains in default on its obligations. Seminary Woods seeks to add a claim for tortious interference with itself[24] in 2012 when PNC purportedly negotiated the sale of the Note to two minority members of Seminary Woods. (DN 232-2, ¶ 85, Proposed Count One) It also alleges that, after the filing of this action,

---

[23]Seminary Woods alleges in its Proposed Second Amended Counterclaim that in December 2011 PNC presented an EUF program to it, but that the terms were unsatisfactory. (DN 232-2, ¶ 75).

[24]Seminary Woods has cited no cases which recognize tortious interference with one's own contracts with an alleged tortfeasor.

PNC attempted to interfere with the defendants' negotiations with potential third-party financing sources.  (DN 232-2, ¶ 82).  Tortious interference requires unjustified interference with contracts or prospective business relations.  Seminary Woods' proposed claims lack sufficient detail to raise their conclusory statements that PNC engaged in "wrongful conduct" above sheer speculation.  They fail to state facts to support an assertion that the alleged steps taken after Seminary Woods defaulted and after the commencement of this litigation was somehow improper.

Finally, Seminary Woods alleges that PNC has interfered with its contracts with prospective purchasers by "...attempting to seize deposit funds of these purchasers, thereby causing them not to perform under their respective purchase agreements..."  Article VI, § 6.1(I) of the Construction Loan Agreement (DN 1-16, p.20) which has been reaffirmed numerous times by the contracting parties, provides that "In no event shall the Lender be required to disburse any amount [from the Sales Contract reserve Account[24]]...if an Event of Default or Conditional Default shall exist."  Seminary Woods has alleged nothing in its counterclaims, present or proposed, which provide any foundation for a claim that the withholding of purchasers' deposits constitutes unjustified interference with contracts.

The claims for interference with contracts and prospective business relations will be dismissed. The proposed amendment will also be denied as futile.

---

[24]The "sales Contract Reserve Account" is defined in the Construction Loan Agreement as "a reserve account at Lender for the purpose of holding all non-refundable deposits made pursuant to Sales Contracts and disbursing such funds as provided for herein."  (DN 1-16, p. 5).

10.  Promissory Estoppel and Equitable Estoppel Claims

The contracting parties claim that they relied to their detriment upon promises of PNC to provide an EUF program and to provide fair and reasonable loan extensions.[25]

(a)

As noted in *General Aviation, Inc. v. Cessna Aircraft Co.*, 915 F.2d 1038, 1042 (6th Cir. 1990), "Promissory estoppel is not a doctrine designed to give a party to a negotiated commercial bargain a second bite at the apple in the event it fails to prove breach of contract."  915 F.2d at 1042, *quoting Walker v. KFC Corp.*, 728 F.2s 1215 (9th Cir. 1984).

The court has found that there was no breach of the written loan agreements or fraud or duress in their procurement.  The court has also found that the alleged oral promises are unenforceable as they do not possess the elements of a contract, they relate to an opinion or promise of a future event, they fail to satisfy the Statute of Frauds requiring a writing in matters concerning the lending of money, and the alleged oral promises contradict the terms of the written agreements which are integrated documents memorializing all of the terms agreed upon by the parties.

It is clear under Kentucky law that detrimental reliance upon an alleged oral contract alone is insufficient to defeat the statute of frauds; actual fraud must be shown.  *Rivermont Inn,* 113 S.W.3d at 642.  Further, as found in *Rivermont Inn*, the element of reasonable reliance is missing here:

> A key element of promissory estoppel...is that the defendant must reasonably expect an oral promise or understanding to induce reliance on the part of the plaintiff. [H]aving received acknowledgment in writing on more than one occasion...that no

---

[25]Seminary Woods' Amended Counterclaim contains a claim for promissory estoppel (DN 56, Count Ten) but the Proposed Second Amended Counterclaim abandons this claim.

> oral promises are made...[the defendant] could not reasonably expect that [the plaintiff] to solicit an oral promise from one of its vice presidents and then change its position in reliance on such a promise. Even assuming, arguendo, that the conversation took place exactly as [the plaintiff] asserts, it does not follow that the doctrine of promissory estoppel may be invoked as a result of that conversation.

*Id.* at 642-43.

In the case at bar, repeated discussions concerning end user financing did not yield any enforceable agreement to provide an EUF program, despite PNC's apparent reassurances that it was willing to negotiate such a program in the future. In the original Commercial Note, the contracting parties acknowledged that

> This Note and, to the extent consistent with this Note, the other Related Writings, set forth the entire agreement of Borrower and Bank as to the subject matter of this writing (which writing shall be narrowly construed) signed by Bank contemporaneously with or after the execution and delivery of this Note. Without limiting the generality of the foregoing, Borrower hereby acknowledges that Bank has not based, conditioned, or offered to base or condition the credit hereby evidenced or any charges, fees, interest rates, or premiums applicable thereto upon Borrower's agreement to obtain any other credit, property, or service other than any loan discount, deposit, or trust service from Bank.

DN 1-17, p. 7, ¶ 18. This integration provision was carried over in each of the amendments which acknowledged that the loan documents remained in full force and effect with the exception of items specifically amended therein. *(See ie.,* DN 1-32, p. 8, ¶¶ 3.2, 3.5).

This provision has remained in force and unchanged since the execution of the original Commercial Note. Thus contracting parties have failed to allege facts which suggest a plausible claim for promissory estoppel in the face of the very integration clauses repeatedly affirmed by them in formal documents. As noted in *Miller v. Reminger Co. LPA*, No. 3:11-cv-315-CRS, 2012 WL 2050239, *10 (W.D.Ky. June 6, 2012), "thus the general rationale for the majority rule [that a prior

inconsistent oral promise cannot be the basis of a promissory estoppel claim] is that the written agreements supercede and incorporate all prior oral statements on subjects covered by the written agreement.  The Seventh Circuit's interpretation of promissory estoppel is consistent with the more limited scope of the doctrine apparent from a full review of Kentucky cases.  To hold otherwise, makes the formalities of a written contract meaningless." *Reminger*, *supra*. at *10, *quoting Davis v. Siemens Medical Solutions USA, Inc.*, 399 F.Supp.2d 785 (W.D.Ky. 2005).  *See also, Our Lady of Bellefonte Hospital, Inc.*, *supra.* at *5 ("based upon the record, this Court concludes that an oral promise made prior to execution of a written agreement that is inconsistent with the unambiguous terms of the written agreement cannot form the basis of a promissory estoppel claim.").

The claims asserting promissory estoppel will therefore be dismissed.  The Benz/Fiorinis' Proposed Amended Counterclaim asserting promissory estoppel will be denied as futile.


(b)

The Benz/Fiorinis assert equitable estoppel in their Counterclaim and Proposed Amended Counterclaim  (DN 107, Count Six, DN 119-1, Count Five).

> In order to state a claim for equitable estoppel, the pleader must state (1) conduct, including acts, language, and silence, amounting to a representation or concealment of material facts; (2) the estopped party is aware of these facts; (3) these facts are unknown to the other party; (4) the estopped party acted with intention or expectation that his conduct would be acted upon; and (5) the other party in fact relied on this conduct to his detriment.  *S.R.D. v. T.L.B.,* 174 S.W.3d 502, 506 (Ky.App. 2005).

*Our Lady of Bellefonte Hospital, Inc.*, *supra* at *5.

The Benz/Fiorinis' Counterclaim alleges that the contracting parties believed that PNC would comply with its obligation to provide for fair extensions of the loan agreement and with its

promise to provide an EUF packages, and at no time did it reveal to them that it did not intend to perform.  They allege they relied to their detriment upon these circumstances.  (DN 107, ¶¶ 43-45). They assert the same allegations in embellished form in Count Five of the Proposed Amended Counterclaim.  (DN 119-1, ¶¶ 88-90.

For a number of reasons, the Benz/Fiorinis have failed to state a claim  for equitable estoppel upon which relief can be granted.

First, equitable estoppel "typically only applies where the estopped party engages in a course of conduct amounting to representation or concealment of material facts.  The court has concluded that the statements concerning an EUF program do not address past or present fact.  The loan documents do not include any terms concerning an EUF program nor is there any enforceable agreement outside the bounds of the loan documents.  Further, similar to the facts in *Our Lady of Bellefonte Hospital*, merger and integration clauses in the written documents preclude an equitable estoppel based upon the oral representations of PNC.  *Id.* at *5-6.  Additionally, any agreement by PNC relating to the loaning of money must be in writing in satisfaction of the statute of frauds in order to be enforceable.  There is no exception to this requirement for equitable estoppel.  Therefore, the  Benz/Fiorinis cannot establish that material facts were unknown to them.  They were necessarily fully aware that they had no enforceable agreement from PNC to provide an EUF program.  *See also, Rivermont Inn,* 113 S.W.3d at 643 ("Rivermont does not have a 'lack of knowledge' with regard to the facts, nor did it rely in good faith upon the conduct or statements of the defendants. It acknowledged in writing that no oral agreements or understandings existed with respect to licenses.").

The claim asserting equitable estoppel will be dismissed for failure to state a claim upon which relief may be granted.  The motion for leave to file  the Proposed Amended Counterclaim asserting equitable estoppel will be denied as futile.


### 11.  Punitive Damages

The contracting parties assert claims for punitive damages in both their current counterclaims and in their proposed amended documents.  "[A] plaintiff cannot recover punitive damages against a defendant unless that defendant's conduct was the proximate cause of any injury to the plaintiff." *M.T. v. Saum*, 3 F.Supp.3d 617, 625 (W.D.Ky. 2014), *citing Taylor v. King*, 345 S.W.3d 237 (Ky.App. 2010).  As the court has found that the counterclaims of the contracting parties fail to state a claim upon which relief can be granted, their claims for punitive damages must also be dismissed.


### 12.  Proposed Separate Claims of WRP

The court would be remiss if it did not specifically address Seminary Woods' argument concerning Whittington Realty Partners, LLC ("WRP")  in support of its motion for leave to file a Proposed Second Amended Complaint.  WRP is the majority member of Seminary Woods.  It is undisputed that Norman E. Risen is the managing member and controlling interest holder in WRP.

In its Proposed Second Amended Counterclaim, Seminary Woods seeks an alternative avenue to pursue its claims without running afoul of the reaffirmations of contract terms and releases of claims against PNC.  Seminary Woods proposes that WRP be permitted to bring the very same claims asserted by Seminary Woods for fraud and misrepresentation, because it is not barred by an individual release of claims. WRP was not a signatory to the loan agreements.  Seminary Woods

contends that WRP states claims in its own right against PNC which stand independent of those of Seminary Woods because WRP sunk the "lion's share" of operating cash into the project and it was "enticed" into continuing to do so on the promise of forthcoming EUF for condominium purchasers. (DN 232-2, ¶¶ 59, 81).

What is glaringly absent from this proposed amended pleading are any *facts* which remotely distinguish WRP from Seminary Woods. There is no allegation that WRP had any direct contractual relationship with PNC. This point separates this case from the cases cited by Seminary Woods in which independent claims were recognized where there was an independent rather than derivative ground for such claims. WRP alleges that it was damaged by PNC through its membership in Seminary Woods. Seminary Woods argues that "When its third-party financing provider (PNC) refused to extend credit, *Seminary turned to the second source; member-provided capital* which, as PNC well knew, came almost exclusively from one source: WRP." (DN 231-1, p.3).

Thus the allegations fail to support a theory that WRP has independent claims to assert against PNC. WRP's infusions of cash were made into the Seminary Woods project when PNC purportedly refused to fund it. Seminary Woods' proposed revisions to its counterclaim are unsuccessful in differentiating WRP from any other investor/member of Seminary Woods:

> 48. Nevertheless, relying upon the promises of PNC to provide EUF and a good faith extension of the Loan Agreement, *the Defendants* forewent the opportunity to seek third party financing for the Project and continued to negotiate with PNC throughout the summer of 2009. *The Defendants – almost exclusively WRP – continued to pour money into the Project* during the interim, at a rate approaching $100,000 per month.

> 59. Relying upon PNC's repeated promises to make available EUF for prospective purchasers, *the Defendants* continued injecting tremendous sums of money into the Project, *with the lion's share* of these funds (some $2,000,000 between the spring of 2009 and summer of 2010) *coming from WRP*.

- 49 -

64. All the while, *the Defendants* (*again, almost exclusively WRP*), *continued to pour money into the Project* in an effort to limp the Project along until credit was available to generate sales.  These investments were made based on repeated, fraudulent representations that PNC Mortgage would make available EUF.

81. PNC ultimately had a single goal – to shed itself of Seminary Woods – and it repeatedly said whatever was necessary to position itself to accomplish this goal, regardless of its *impact upon the Defendants*.  By repeatedly *enticing the Defendants – notably WRP –* to continue to inject funds into the Project, PNC ensured that it would cripple the Defendants' ability to support the Project or obtain financing from third party sources.  This would allow PNC to seize the Project and market it as it saw fit, or *once the Defendants were financially disabled*, allow PNC to sell the Note at whatever value it could extract from whatever source and then *complete its ruination of the individual Defendants by collecting upon the personal guarantees.*

DN 232-2.  (emphasis added).

As previously stated, under Fed. R. Civ. P. 8(a)(2), a pleading must contain a short and plain statement of the claims showing that the pleader is entitled to relief. The pleading standard in Rule 8(a)(2) does not require detailed factual allegations, but "demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2008) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (1955)).

Seminary Woods concludes that WRP has a separate interest to protect, yet it has alleged no facts to support this conclusion.  It seeks to distinguish WRP solely on the basis that it provided the lion's share of cash infusions into the project.  No conduct separate and apart from the alleged wrongs to Seminary Woods is alleged to have been directed at WRP.  Indeed, paragraph 81 illustrates that the conduct with which WRP is concerned *is the conduct complained of by Seminary Woods*; that is, "repeatedly enticing the Defendants – notably WRP—to continue to inject funds into the Project.  This semantic "me too" distinction is simply ineffectual.  The proposed amended document is devoid of facts to support the assertion of independent claims by WRP in this matter.

The claims offered on behalf of WRP do not save the claims from Rule 12(b)(6) dismissal. The facts alleged in the Proposed Second Amended Complaint, including those which attempt to distinguish WRP, are insufficient to state a claim upon which relief can be granted. Therefore the motion for leave to file a Proposed Second Amended Counterclaim will be denied as futile.

### C.  Evans' Motion for Summary Judgment/PNC's Cross-Motion for Summary Judgment

The defendants, Steven J. and Gerry Evans ("the Evans"), have moved for summary judgment against PNC, Norman E. Risen, and Seminary Woods, LLC.  (DN 195)  PNC has filed a cross-motion for summary judgment.  (DN 202)  Risen and Seminary Woods have objected to the Evans' motion.  (DN 203).

It appears to be undisputed that the Evans entered into an agreement to purchase Condominium Units 604 and 607 on January 1, 2008, and a "side agreement" concerning the down payment of $140,000.00 on January 17, 2008.  A copy of the executed Condominium Sales Contract has been provided.  It bears the signature of Norman E Risen, Member, on behalf of Developer Seminary Woods, LLC  (DN 195-3, p. 10).  No copy the "side agreement" has been produced. Risen denies executing any agreement with the Evans in his own individual name.  In connection with the "side agreement," the Evans paid $140,000.00 in deposits on the condominium units.

The Evans allege that in May 2008 construction of the units had not begun and finish work had not been completed, as required by the agreement.  The Evans allege that they entered into an oral agreement with Risen and Seminary Woods in which all parties agreed to the rescission of the contract.  Risen purportedly told the Evans that the contract was rescinded, but that he did not have

enough cash to pay back their deposit money.  He allegedly stated that they would have to wait for reimbursement until he was able to sell a unit.  On June 9, 2008, the Evans sent Risen a letter dated May 9, 2008 confirming that the Evans were released from the contract by virtue of their agreement to rescind and the promise to return the $140,000.00 deposit.  The Evans allege that in reliance on the agreement to rescind the contract, they purchased a home in which they now reside.

The Evans aver that Risen and Seminary Woods admitted paragraph 10 of the Evans' cross-claim to the effect that the Evans' contract was rescinded and that whoever holds the $140,000.00 deposit has been unjustly enriched and should repay the Evans that sum.  The Evans urge the court to find Risen and Seminary Woods bound by their admission in their answer, and disregard arguments in their brief contrary to this admission.

It does not appear, however, that Risen and Seminary Woods admitted the allegations in that paragraph.  The Answer clearly contains an error.  It states in paragraph 2 that they "deny the allegations in paragraphs 2, 3, 4, 5, 6, 7, 8, 9 and 10 of the Crossclaim."  (DN 195-6, ¶ 2).  The error appears in the next paragraph, paragraph 3, however.  Paragraph 3 states "Crossclaim Defendants admit the allegations in paragraph 10 of the Complaint."  (DN 195-6, ¶ 3).  The document is an answer to the Evans' cross-claim, so the reference to the "Complaint" is clearly in error.  If, in fact, paragraph 3 is referring to the Evans' cross-claim, paragraphs 2 and 3 contradict each other.  Paragraph 2 (*denying* the allegations in paragraph 10 of the cross-claim) and paragraph 3 (*admitting* the allegations in paragraph 10 of the misidentified cross-claim) cannot both be true.

In their response to the Evans' summary judgment motion (DN 203, p. 8), Risen and Seminary Woods explain the error, stating that paragraph 3 should have admitted the allegations in paragraph *11* of the Evans' *cross-claim*.  The Evans' cross-claim, paragraph 11 states:

> On information and belief, the Evans Defendants aver that the Plaintiff, PNC Bank received copies of the Evans' contract to purchase and PNC Bank was paid all or part of the deposit by Norman E. Risen and/or Seminary Woods, LLC.   PNC Bank was therefore, on notice of the vendee's equitable lien held by the Evans Defendants on the mortgaged property by virtue of the deposit.     Further, it is alleged that PNC Bank made several amendments to the construction loan after the execution of the purchase contract by the Evans but took no steps to subordinate the equitable lien held by the Evans.     Therefore, the Evans Defendants are entitled to enforce their equitable lien and they have a priority over PNC Bank for receipt of their deposit money in the amount of $140,000.00 for which they demand judgment.

DN 28, p. 11.

Risen and Seminary Woods' admission of the paragraph 11 allegations would be consistent with their counterclaim asserted against PNC, in the very same document, which states that "The contract purchasers have a priority equitable lien which should be repaid to them prior to any proceeds from any sale being delivered to PNC." (DN 195-6, p. 3).  Thus Risen and Seminary Woods' explanation of the error makes complete sense.

However, the Evans urge that, despite this explanation, Risen and Seminary Woods have not sought to correct the error in their answer.  This is of no moment, as the answer, as plead, *does not* contain an admission with respect to the allegations in paragraph 10 of the Evans' counterclaim. Therefore, the Evans' attempt to bind these defendants to an admission of the facts contained their paragraph 10 is baseless.

The facts averred by the Evans are that they entered into the Purchase Agreement with Risen and Seminary Woods, they paid the deposit, but construction never began on the units, the contract deadlines were not met, and the parties orally mutually agreed to rescind the contract and refund the deposit to the Evans.  The Evans urge that they confirmed the rescission agreement in writing a month later.

- 53 -

Risen and Seminary Woods tell a different story.  They claim that the unit construction never began because the Evans did not finalize their selections and agree to fund their changes/upgrades as required by Section 3.1 of the contract.  They contend that prior to May 2008, the Evans were simultaneously working with two developers, Seminary Woods and Ferriell-Turbeville Development Company, and walked away from the contract without providing Seminary Woods notice of conditions precedent and the time required under the contract to satisfy those conditions.  Risen and Seminary Woods contend that they never refused to satisfy any aspect of the obligation nor state that they did not have the money to complete the units.  They allege that they did not agree with the assertions contained in the Evans' letter and refused to sign it.  (DN 203-3).

The Evans urge that they relied to their detriment on the promise that the contract was rescinded.  (DN 210, p. 2).  There appears to be a genuine issue of material fact concerning whether there was, in fact, such a promise.

The Evans urge that "The great weight of the evidence of admissions in pleadings other than the Answer to Evans [sic] Crossclaim show that Mr. Risen intentionally and fraudulently took the $140,000.00 from the Evans Defendants knowing he was unable to fulfill the contract terms requiring him to build out the units."  (DN 210, p.5).

This generalized allegation is insufficient to evidence an entitlement to summary judgment against Risen and/or Seminary Woods to establish fraud.  The specific allegations in support to which the Evans refer, which are few, involve alleged acts by PNC in 2009 (*ie*., Seminary Woods' Amended Answer and Counterclaim, DN 56, ¶¶ 32, 34, DN 210, p. 6)  In fact, PNC did not purchase its predecessor, National City, until November 2008, a full six months after the Evans alleged that their Contract was rescinded.

- 54 -

The Evans allege that whoever presently holds their $140,000.00 has been unjustly enriched and the money should be paid back to the Evans immediately.  (DNs 195, pp. 15-17,  210, pp. 2-3).  Again, we note that the underlying facts are in dispute concerning the purported default under the Purchase Agreement and any promise of rescission.

This brings us to PNC's cross-motion for summary judgment.  PNC urges that whatever the outcome of the claim between Risen, Seminary Woods, and the Evans to the $140,000.00 deposit, they have not shown that PNC received this money, and, further, PNC has a prior recorded interest which is superior to that of the Evans in recovering any proceeds upon the foreclosure and sale of the property.

In response, the Evans contend that they hold an equitable lien which has priority over the recorded mortgage of PNC.  However, it is beyond dispute that PNC recorded its mortgage on April 20, 2006, 21 months prior to the execution of the Evans' Purchase Agreement and payment of the deposit.  In an effort to circumvent the clear superiority of the PNC mortgage over the Evans' purported equitable claim, the Evans urge that a novation occurred in 2009 when the loan agreement and Note were amended.  Thus they argue that PNC had notice of the Evans' deposit money but failed to subordinate their interest prior to recording the amended documents.  (DN 211, pp. 4-7).  The  Second Amendment to Note (DN 1-31) clearly belie the novation argument, however.  It states at Section 4.5 states:

> No Substitution or Novation.  Nothing in this Amendment shall be construed as a substitution or novation of the Borrower's indebtedness to the Lender under the Primary Loan, which shall remain in full force and effect as hereby amended.

Section 4.6 states:

> No Further Changes.  All other terms of the Loan Documents and [sic] are hereby reaffirmed by the Borrower and Guarantors and all terms and provisions not specifically amended hereby...shall continue in full force and effect.

DN 1-31.

As stated in *G.D. Holdings, Inc. v. Baker Energy, Inc.*, 501 F.Supp.2d 914, 919 (W.D.Ky. 2007),

> Kentucky courts define a novation as "the substitution of a new obligation for an old one, with intent to extinguish the old one, or the substitution of a new debtor for an old one, with the intent to release the latter, or the substitution of a new creditor, with the intent to transfer the rights of the old one to him. " *Truscon Steel Co. v. Thirlwell Elec. Co.,* 265 Ky. 414, 416-17, 96 S.W.2d 1023 (1936); *see also In re Cantrill Const. Co.,* 418 F.2d 705, 707 (6th Cir. 1989); *M.A. Walker Co., Inc. v. PBK Bank, Inc.*, 95 S.W.3d 70, 75 (Ky.Ct.App. 2002).  Intent is the essential element" in proving the existence of a novation, and "[t]he burden of proving a novation [is] on the [party seeking to enforce it.]" *In re Cantrill Const. Co., 418 F.2d at 707.*

The Evans have offered nothing to call into question the clearly expressed intent that the primary loan remain in full force and effect, thus preserving the priority date of the mortgage filed in April of 2006.

The court concludes that PNC is entitled to summary judgment as against the Evans on the claim of superiority of its April 20, 2006 mortgage over any interest the Evans may have in proceeds from the sale of property in this matter.

The Evans appear to have some concern that PNC, Risen, or Seminary Woods may seek to enforce the Purchase Contract against them and compel them to purchase the units.  The court does not find any such claim evident in this action.  The Evans were named in the foreclosure proceedings by PNC in order to establish the relative priority of claims to proceeds.  Risen and Seminary Woods did not cross-claim against the Evans when responding to the Evans' cross-claim against them.  The

concerns of the Evans appear to be unfounded.  The Evans seek a declaration of the court that they cannot be held liable to purchase the units under the Purchase Agreement, as it has been rescinded. While the question of rescission is unclear on the present record, for any number of reasons, it would appear that the contract might not be enforceable against them, not the least of which would be that, as the property is in receivership and the parties are presently in foreclosure litigation, there is an impossibility of performance under the contract terms.  In any event, it appears that the issue has been conceded by PNC, Risen, and Seminary Woods, as they have failed to address the issue in response to the Evans' summary judgment motion.  The court will therefore recognize the release of the Evans from the purchase obligation.  The matter of entitlement to the $140,000.00 deposit remains outstanding however.

## E.  Conclusion

Numerous briefs have been penned in this case offering rich background material concerning, among other subjects, the sale of NCB to PNC (colorfully termed a "shotgun wedding"), alleged poor banking practices, the infamous Mortgage Crisis, and alleged plots orchestrating the demise of the Seminary Woods project.  None of this colorful detail adds any substance to the deficient counterclaims, current or proposed, asserted against PNC.

For the reasons stated herein, Counts I through VIII, X and XI of the Seminary Woods parties' Amended Counterclaim and the entire Counterclaim of the Benz/Fiorini parties' Counterclaim will be dismissed.  The motions of Seminary Woods and the Benz/Fiorinis to amend

their respective counterclaims will be denied.  Summary judgment will be granted in favor of PNC as to the Evans, and the Evans' motion for summary judgment will be denied.[26]


**IT IS SO ORDERED.**

July 2, 2015

**Charles R. Simpson III, Senior Judge**
**United States District Court**

---

[26]The various other motions will be disposed of as previously set forth on pgs. 1-3 and need not be restated.